

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EMERSON ELECTRIC CO.,

             Plaintiff,

-against-

ASSET MANAGEMENT ASSOCIATES OF
NEW YORK, INC.,

             Defendant.
-----------------------------------------------------------X

MEMORANDUM AND ORDER
08-CV-1489 (TCP) (AKT)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   MAR 20 2012   ★

LONG ISLAND OFFICE

PLATT, District Judge.

Before the Court are two motions: Defendant's Motion for Summary Judgment and Plaintiff's cross-Motion for Summary Judgment. For the following reasons, (1) Defendant's Motion for Summary Judgment is hereby **DENIED** in part and **GRANTED** in part and (2) Plaintiff's cross-Motion for Summary Judgment is hereby **GRANTED** in part and **DENIED**, without prejudice, in part.

## BACKGROUND

### A. Facts

Emerson Electric Co. ("Plaintiff") is a Missouri corporation with its principal place of business located in the State of Missouri. Pl.'s Compl. ¶ 2. Asset Management Associates of New York, Inc. ("Defendant") is a New York corporation with its principal place of business located in Southampton, New York. *Id.* at ¶ 3. This Court holds diversity jurisdiction pursuant to 28 U.S.C. § 1332.

1. **The Agreements**

On November 8, 2006, Emerson Telecommunications Products LLC ("ETP"), Plaintiff's affiliate, and Defendant executed an Acquisition Agreement, which transferred to Defendant "the capital stock of Emerson Network Power Optical Connectivity Solutions, Inc. . . . as well as certain business assets of Emerson Network Power Connectivity Solutions, Inc." ("the Divested Businesses"). Acquisition Agreement, November 8, 2006 [hereinafter *Acq. Agt.*] (*see* Pl.'s Cross 56.1 Stmt., Ex. 3). Before the execution of the agreement, both of these entities were Plaintiff's indirect subsidiaries. Pl.'s Cross 56.1 Stmt. ¶ 3. The Acquisition Agreement required that "immediately following the Closing, Buyer shall change the name of Optical Connectivity to 'CSI Technologies, Inc.' or such other name as shall be selected by Buyer . . . and shall contribute the Purchased Assets and the Assumed Liabilities to such entity." *Acq. Agt.* § 2.1(c). On November 8, 2006, Charles S. Holmes, as CSI's sole stockholder, executed a "Written Consent of the Sole Stockholder of Emerson Network Power Optical Connectivity Solutions, Inc." to reflect the name change. Pl.'s Cross 56.1 Stmt., Ex. 5.

Concurrent to the Acquisition Agreement, the parties executed a Transition Services Agreement ("TSA") "pursuant to which, [Plaintiff] agreed to perform certain delineated business services to and for the Divested Businesses . . . ." [herein *TSA*] November 8, 2006, (*see* Pl.'s Compl., Ex. A). "The Transition Services covered by the TSA included: (1) manufacturing and support operations for the Divested Businesses in a shared Emerson facility located in Reynosa, Mexico ([a/k/a,] the "Reynosa Shelter") . . . ; (2) information technology services . . . ; and (3) services related to support of a China based office . . . ."[1] Pl.'s Cross 56.1 Stmt. ¶ 7. Defendant was responsible for an allocated portion of the Reynosa Shelter's manufacturing and support expenses, which were divided amongst all of the businesses that operated out of the Reynosa

---
1 The services were delineated specifically in Schedules A-C of the TSA.

Shelter, based upon certain factors, such as the amount of space or number of employees each business anticipated it would use during the fiscal year. *TSA* § 3(b). Furthermore, the TSA defined how the parties would allocate Defendant's share of manufacturing and support operations: certain allocated expenses were determined by the forecasted square footage usage of the purchased businesses at the Reynosa Shelter at the commencement of the fiscal year; certain allocated expenses were determined by the forecasted number of Reynosa Shelter employees to be used by the purchased businesses for the fiscal year. *Id.*

The TSA mandated that the transition services provided to Defendant would be "substantially in accordance with the recent historical practice of Plaintiff and/or its Affiliates" and that "[i]t is the intent of the Parties that, to the extent practicable, the Transition Services will be provided by Plaintiff . . . in substantially the same manner as such Transition Services were provided to the [Divested] Business[es] prior to the date hereof." *TSA* § 1(b). Defendant would pay for the services within thirty (30) days of each invoice's issuance. *Id.* at § 1(c). If "[Defendant] failed to pay any invoice within five (5) days after [the invoices] are due, [Defendant] would be obligated to pay" an annualized interest rate of 5%. *Id.* at § 1(d). Under section 3 of the TSA, "[Defendant] further agreed to reimburse or compensate [Plaintiff] for the direct expenses incurred in the course of [Plaintiff's] performance . . . as well as for certain delineated taxes and duties." Pl.'s Compl. ¶ 10.

### 2. The TSA Invoices

Prior to the acquisition, Plaintiff issued monthly billing statements to the finance managers of each of the businesses that operate in the Reynosa Shelter. Pl.'s Cross 56.1 Stmt. ¶ 51. In the case of the Divested Businesses, Plaintiff issued the monthly invoices to Nidia

3

Ramirez, the Divested Businesses' finance manager. *Id.* at ¶ 52. After Defendant's purchase of the businesses, Plaintiff continued to issue the TSA monthly invoices to Ramirez. *Id.* at ¶ 57.

CSI paid for all services rendered through July 2007 (*i.e.*, the last invoice paid was issued on August 1, 2007). *See, e.g.*, Pl.'s Cross 56.1 Stmt. ¶ 80. Defendant claims CSI paid these invoices in protest and with reservations because Defendant feared that if it did not pay, Plaintiff would terminate the TSA. Def.'s Ctr. 56.1 Stmt. ¶ 64(e). According to Defendant, Brian Mason and Patrick Cerroni, Plaintiff's employees, threatened on numerous occasions to terminate the TSA if CSI failed to pay the invoices. Def.'s 56.1 Stmt. ¶ 51. CSI could not risk termination of the TSA because CSI did not yet have a facility in which to operate in Mexico. *Id.* at ¶ 64(f). Plaintiff contends that it made no threats to anyone, but, instead, reminded Defendant of the TSA's requirement that invoice payments are due within thirty days of issuance. Pl.'s Ctr. 56.1 Stmt. ¶ 51.

Plaintiff issued separate monthly invoices to Ramirez for the IT Services listed in Schedule B of the TSA. Pl.'s Cross 56.1 Stmt. 81. CSI paid for the IT services rendered through August 2007 (*i.e.*, the last IT invoice paid was issued on August 31, 2007). Defendant claims that the invoices were paid in protest and with reservation. Def.'s Ctr. 56.1 Stmt. ¶ 82(a).[2]

On September 4, 2007, October 2, 2007, and November 1, 2007, Plaintiff issued to Ramirez the TSA invoices for services rendered and expenses incurred for the month of August 2007, September 2007, and October 2007, respectively. Pl.'s Cross 56.1 Stmt. ¶¶ 83, 86, 89. No portion of these invoices has been paid. *Id.* at ¶¶ 84, 87, 90. Defendant contends that it did not object to the charges on any of the unpaid invoices because CSI, not Defendant, operated the

---

[2] According to Defendant, CSI advised Plaintiff that Defendant did not need $7,500 in IT support services for monitoring, intrusion detecting and security. *Id.* at ¶ 82(b). Helenek demanded that Robert Leppert, Plaintiff's employee, cease providing and billing for these services following an electronic mail ("e-mail") communication sent to Helenek by Holmes on January 5, 2007. *Id.* at ¶ 82(c).

4

businesses under the TSA. Def.'s Ctr. 56.1 Stmt. ¶ 85(a). Rather, Defendant argues, CSI, which received the invoices, objected to charges on all of the unpaid invoices. Def.'s Ctr. 56.1 Stmt. ¶ 85(b).

Plaintiff claims that Defendant moved the Divested Businesses out of the Reynosa Shelter at the end of October 2007 after Defendant established its own factory. Pl.'s Cross 56.1 Stmt. ¶ 92. Defendant claims that CSI moved out of the Reynosa Shelter in or around September 2007. Def.'s Ctr. 56.1 Stmt. ¶ 92(b).

After the November 2007 invoice, Plaintiff charged the Defendant only for direct costs incurred prior to the Divested Businesses departure from the Reynosa Shelter. Pl.'s Cross 56.1 Stmt. ¶ 93. On December 5, 2007 and April 10, 2008, respectively, Plaintiff issued to Defendant the TSA invoices for the direct charges incurred by the Divested Businesses for November 2007 through February 2008. *Id.* at ¶¶ 94, 97. These invoices have not been paid. *Id.* at ¶¶ 95, 98.

Plaintiff issued separate monthly TSA Schedule B invoices to CSI for the IT charges incurred for the months of September 2007 through March 2008, which have not been paid. Pl.'s Cross 56.1 Stmt. ¶¶ 100, 101. Plaintiff argues that the total amount of the unpaid invoices equals $1,165,613.80. *Id.* at ¶ 102.

Defendant disputes this amount; Defendant claims it objected to certain charges. For instance, CSI's John Helenek swore that he objected to and questioned certain charges on the invoices for meetings, teleconferences or correspondence with certain individuals and requested documentation from Plaintiff to substantiate the charges. Helenek Decl. ¶ 9. CSI alleges it complained additionally about purportedly erroneous customs and duties charges due to Plaintiff's erroneous billings related to goods on customs manifests and the manner in which Plaintiff allocated "overhead" costs. *Id.* at ¶ 10. Defendant alleged it complained about Plaintiff's

use of a "tax offset mark-up" of 5% through August 2007 when it unilaterally and inappropriately increased the rate to 6.5% and sought to recover the increased rate retroactively because CSI had ceased paying the invoices." Def.'s Ctr. 56.1 Stmt. ¶ 18(c)-(j). When CSI became qualified to conduct business in Mexico, Defendant claims its accountants advised that the actual cost of the tax offset mark-up was significantly less than the 6.5% of costs (or 6.9% of assets) assessed by Plaintiff pursuant to the TSA. *Id.* at ¶ 18(k). Helenek contends that, despite numerous requests, Plaintiff has failed to produce any documentation reflecting the taxes actually paid to the Mexican government. Helenek Decl. ¶ 18. After CSI paid the invoice charges in full, Plaintiff refunded the amounts of the disputed charges. *Id.* at ¶ 18(n).

### 3. TSA Points-at-Issue

#### a. Defendant's Assignment to CSI

Defendant contends that it assigned its rights under the contract to CSI pursuant to TSA section 17. Def.'s Ctr. 56.1 Stmt. ¶ 104. The TSA's preamble states:

> [F]ollowing the closing and for a period of time not to exceed one year from and after the Closing, the Parties desire that Plaintiff shall provide, or cause to be provided, to [Defendant] and/or [Defendant]'s Affiliates (which the Parties acknowledge shall include Optical Connectivity from and after the Closing) certain services which were provided to the Business prior to the Closing in furtherance of the orderly transition of the Business.

The TSA states clearly that the business purchased by Defendant, defined as Optical Connectivity, was deemed to be Defendant's affiliate after the closing and sale. *Id.* at ¶ 23 (*see Acq. Agt.* § 1.2 ("Optical Connectivity shall be deemed an Affiliate of the Business Seller prior to Closing and an Affiliate of Buyer after Closing.")). The Acquisition Agreement defines affiliate as "any person or entity which is controlling, controlled by, or under common control with, directly or indirectly through any person or entity, the person referred to." *Id.*

6

The Acquisition Agreement further required that as part of the closing process, Defendant would transfer the assets of the copper cable business it purchased, ENPCS, to Optical Connectivity, the Maryland Corporation that Defendant purchased in whole; Defendant would change the name of Optical Connectivity to "CSI Technologies, Inc." ("CSI") for the purpose of operating the consolidated fiber cable and copper business. *Acq. Agt.* § 2.1. Defendant is 100%-owned and -controlled by one person: Charles S. Holmes. *See* Pl.'s Cross 56.1 Stmt. ¶ 26. Following the closing, Holmes also owned and controlled CSI in its entirety. *Id.* at ¶ 27.

As noted *supra*, the Acquisition Agreement defines affiliate as any entity "under common control with" Defendant. Holmes testified that he "controls" Defendant and CSI because he owns the stock for both companies and they are his affiliates. *See* Holmes Dep. 23:17-20, Oct. 7, 2009, Masella Decl., Ex. C. Control is defined as "[p]ower or right to order or direct." BLACK'S LAW DICTIONARY 298 [5th ed.] (citing *Mid-Cont. Petroleum Corp. v. Vicars*, 47 N.E.2d 972 (Ind. 1943)). The Assignment and Assumption Agreement, between CSI and Defendant, is executed solely by Holmes for each entity: as President of Defendant and as Chairman of CSI, respectively. *See* Am. Reply Mem. L. Supp. Mot. Summ. J., Ex. 1.

### b. Notice Clause

Defendant argues it "was only responsible for paying invoices that [Plaintiff] delivered to [Defendant] in accordance with section twelve of the TSA." *Id.* at ¶ 13(b). Section twelve (the "Notice Clause") provides names and addresses for the purpose of delivering "all notices, requests, demands, and other communications required or permitted under this Agreement." Both parties agree that Teresa Mendoza, Plaintiff's Controller, "normally sen[t] the invoices to Nidia [Ramirez, employee of CSI] when [Ramirez] was part of Emerson. After [the TSA], now that [Ramirez] worked for CSI . . . , [Mendoza] continue[d] [to send Ramirez] the invoices."

7

Mendoza Tr. 75:10-15, June 12, 2009, Masella Decl., Ex. F. Both parties agree that when Ramirez moved to CSI, Mendoza "requested [Ramirez] to tell me to which company I should invoice [] and [Ramirez] mentioned [CSI] and they provide[d] the address." *Id.* at 75:16-19. Charles Holmes, Defendant's President and Chairman of CSI, testified that Defendant did not receive copies of the final three invoices until they were served with the instant Complaint. Holmes Dep. 90:12-21. The TSA appointed Dennis McCarthy as Defendant's Secretary/Treasurer and Defendant's designated recipient of notices as to the TSA's Notice Clause. *See, e.g.*, McCarthy Dep. 11:6-9, Oct. 13, 2009, Masella Decl., Ex. D; *see also TSA* Notice Clause. McCarthy, also CSI's President (McCarthy Dep., 10:14-15), affirmed, in his deposition, that he delegated the responsibility of reviewing the TSA invoices to "Helenek and his staff," including Ramirez, received the TSA invoices. McCarthy Dep. 105:5-106:5; 106:23-107:16. Holmes states in his deposition, however, that he reviewed "copies, partial copies of the [Transition Services] invoices" with Helenek during his review of his companies' monthly profit and loss statements. Holmes Dep., 87:17-24.

According to Defendant, while the TSA required payment in thirty days, Plaintiff accepted payment of invoices sixty days after the invoice date as per an agreement between CSI and Plaintiff. Def.'s Ctr. 56.1 Stmt. ¶ 12(b). Defendant contends that section 1(b) of the TSA "required the invoices be issued 'substantially in accordance with the recent historical practice of [Plaintiff]'" and Plaintiff failed to follow this requirement. *See id.* at ¶ 13(f)-(g) (quoting *TSA* § 1(b)).[3] Plaintiff contends that, by continuing to send the invoices to Ramirez (as Plaintiff had

---

3 Defendant argues that "[i]nstead, the invoices consist of summary spreadsheets listing calculated charges which did not include back-up documentation or other support. Def.'s Ctr. 56.1 Stmt. ¶ 13(g). Defendant argues additionally that "[n]o exchange rate is listed on the invoices, despite the fact that [Plaintiff's] subsidiaries [operating] in the same Reynosa Shelter as CSI historically received invoices which contained the conversion rate from pesos to dollars. *Id.* at ¶ 13(h).

done before the TSA and Acquisition Agreement), Plaintiff followed its historical practice. *See, e.g.*, Pl.'s Cross 56.1 Stmt. ¶ 57. Plaintiff contends that it fully performed its obligations under the TSA and it issued the monthly invoices to Defendant for the allocated expenses, as well as all direct costs incurred on behalf of Defendant's business operations in the Reynosa Shelter. *Id.* at ¶ 15.

## DISCUSSION

### A. Legal Standard for Summary Judgment

A motion for summary judgment may not be granted unless a court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting FRCP 56(c)). "Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

There is a "genuine" issue of fact only if the "evidence [presented] is such that a reasonable jury could return a verdict for the nonmoving party." *Giodano v. City of New York*, 274 F.3d 740, 746-47 (2d Cir. 2001). Plaintiff's evidence may not amount to a mischaracterization of facts because "attempts to twist the record do not create a genuine issue of material fact for a jury." *Kim v. Son*, No. 05-CV-1262, 2007 WL 1989473, at *6 (E.D.N.Y. July 9, 2007). Therefore, "where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." *Holz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Also, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Finally, Federal Rule of Civil Procedure 56(c) mandates that all facts under consideration in a motion for summary judgment be directly supported by proof in admissible form.

**B.   The Assignment Clause**

> This Agreement and various . . . obligations arising hereunder shall inure to the benefit of and be binding upon the Parties hereto and their successors and permitted assigns. Neither this Agreement nor any of the . . . obligations hereunder shall be . . . assigned . . . , except that [Defendant] shall have the right to . . . assign its *rights* hereunder to any entity which is controlled by [Defendant] or by [Defendant's] Affiliates . . . . *No such assignment shall relieve [Defendant] of any liability or obligation hereunder.*

*TSA* § 17 (Emphases added).

## C.  Breach of Contract Claim

### a.  Standard

Section 16 of the TSA states that the TSA "shall be governed by, and construed in accordance with" New York State law. In New York, to establish breach a contract, a party must prove: (1) the existence of a valid contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of that contract, and (4) damages. *See, e.g., JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010).

" '[W]hen parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.' " *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)). Whether a contract's terms are ambiguous, however, is a question of law decided by the court. *See W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

### b.  Analysis

The parties do not dispute that the TSA is a valid agreement between the parties. There is no genuine dispute of material fact that Plaintiff suffered damages. The parties disagree as to whether Plaintiff performed its duties under the TSA's Notice Clause. The parties disagree as to whether Defendant breached the TSA.

#### i.  Plaintiff Performed

The Notice Clause does not concern invoices. No reasonable fact-finder would conclude, for example, that the parties intended that copies of invoices should be sent to the parties' transactional attorneys. Further, the TSA does not demand explicitly that Plaintiff follow "recent historical practice" as to invoicing; instead, the TSA requires the actual Transition Services be

provided in such a manner. *See TSA* §1(b). Logically, invoicing for services rendered cannot be one of the services.[4] If the TSA intended to make Plaintiff invoice according to "recent historical practice," the parties would have re-stated the term in the invoicing subsections, TSA subsections 1(c)-(d). As written, however, there is no contractually prescribed person to whom invoices should be sent. Instead, since the TSA is silent as to invoice delivery, Plaintiff reasonably continued to send invoices to the person to whom they sent invoices prior to the Acquisition Agreement: Nidia Ramirez. Ramirez, in fact, directed Plaintiff to do so. *See* Mendoza Tr., 75:10-15. Post-closing, Ramirez became an employee of CSI, Defendant's Affiliate. Holmes, Defendant's President, reviewed at least some of the paid invoices; he never objected to the manner of delivery.

Assuming, *arguendo*, the Notice Clause did intend to include invoices, a reasonable fact-finder would find Defendant waived the provision. McCarthy admitted he delegated the invoice operation to Helenek and Ramirez. *See* McCarthy Dep., 105:5-106:5. McCarthy is not only CSI's President; he is also Defendant's Secretary/Treasurer. Plaintiff invoiced Defendant in the same manner throughout the post-closing period. Mendoza sent the invoices to Ramirez who worked for CSI's Helenek. The implicit assent of McCarthy and Holmes acted as a waiver of the Notice Clause terms. *See New York Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297-98 (N.Y. 1940) ("Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong.").

---

4 An attorney's legal services do not include the invoicing for those services, *i.e.*, he is not hired in order to provide the invoices. A client hires an attorney for the legal service; then he is invoiced *for* the services.

### ii. Defendant Breached

Section 3 of the TSA states that "[Defendant] shall compensate [Plaintiff] for each of the Transition Services provided to [Defendant] during the term . . . all reasonable, third-party out-of-pocket expenses incurred by [Plaintiff] in connection with providing the Transition Services . . . . [and shall] reimburse [Plaintiff] for all [non-net income] taxes imposed on the Transition Services." The TSA permitted Defendant to transfer or assign Defendant's TSA *rights* solely to "any entity which is controlled by [Defendant] or by the Affiliates of [Defendant] including Optical Connectivity." TSA § 17.[5] Defendant renamed Optical Connectivity as CSI pursuant to the Acquisition Agreement. *See Acq. Agt.* § 2.1. By the clear terms of the TSA, therefore, CSI is Defendant's affiliate and under common control with Defendant. Further, Defendant may not, under section 17, assign its TSA liabilities or obligations. The TSA could not have been written any more clearly on the assignment issue. Defendant remained liable for its TSA obligations, even if Defendant assigned its TSA rights.

Plaintiff performed the Transition Services and Defendant, according to the TSA, is obligated to pay Plaintiff for those services, even if Defendant assigned its TSA rights. The Court finds no genuine dispute of material fact that Defendant is liable for any breach of the TSA. As to Plaintiff's breach of contract claim, therefore, the Court (1) grants Plaintiff's cross-motion and (2) denies Defendant's motion.

Inherent to that holding, the Court finds no genuine dispute of fact that Plaintiff suffered damages as a result of the breach. The Court finds, however, there is a genuine dispute of material fact as to the *amount* of damages suffered by Plaintiff. The parties disagree, for instance, on when CSI ceased to use the Reynosa Shelter; the parties disagree about certain charges listed

---

5 The TSA's Preamble states that "[c]apitalized terms [such as Affiliates] used but not defined herein shall have the meanings ascribed to them in the Acquisition Agreement."

on the outstanding invoices. The determination of these issues, amongst others, will determine how much contractual principal and interest is owed by Defendant. This amount, therefore, must be determined at trial or jointly agreed upon by the parties.

**D.     Claims of "Services Sold and Rendered" & "Account Stated"**

   **a. Standard**

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (citing *Blanchard v. Blanchard*, 94 N.E. 630, 631 (N.Y. 1911)). "A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Id.* (citing, *e.g.*, *Parsa v. New York*, 474 N.E.2d 235, 237 (N.Y. 1984); 1 Williston, Contracts § 3A)). " 'Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved.* The law creates it, regardless of the intention of the parties, to assure a just and equitable result.' " *Id.* (quoting *Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970)) (emphasis in original).

"It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.* (citing, *e.g.*, *Soviero Bros. Contracting Corp. v. City of New York*, 142 N.Y.S.2d 508 (N.Y. App. Div. 1955)).

### b. Defendant's Motion is Granted

Plaintiff's second and third claims are quasi-contractual claims; these claims are precluded by Plaintiff's valid breach of contract claim. All claims arise out of the same subject matter: Defendant's non-payment of Plaintiff's expenses and services rendered pursuant to the TSA. Moreover, a fact-finder may not award Plaintiff for damages beyond what Plaintiff is entitled to under its breach of contract claim. Defendant's motion, as to Plaintiff's second and third claims, is granted; Plaintiff's cross-motion, as to these claims, is denied without prejudice.[6]

### E. Attorneys' Fees & Costs

#### a. Standard

" 'Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule.' " *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 423-24 (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003)). Parties may agree to, and be bound by, clearly-intended, contractually-awarded attorneys' fees awards so long as a court avoids " 'inferring duties that the parties did not intend to create.' " *Id.* at 424 (quoting *Oscar Gruss & Son*, 337 F.3d at 199).

#### b. Defendant Owes Attorneys' Fees & Costs

According to TSA section 6(e), Defendant is to indemnify Plaintiff "against any and all Losses incurred by [Plaintiff] resulting from or arising out of . . . the breach by [Defendant] of [its] obligations under this Agreement." In section 6(f), "Losses" is defined to include losses, fees, costs, and "reasonable expenses incurred in connection therewith (including . . . costs and

---

6 If the Court's ruling on the breach of contract claim is appealed and subsequently vacated, or otherwise successfully reversed, Plaintiff may re-file its cross-motion as to the quasi-contract claims.

expenses of suits and proceedings and reasonable fees and disbursements of counsel) . . . ." The Court finds the parties explicitly intended to award attorneys' fees and costs to Plaintiff for any losses related to Defendant's breach of the TSA. As such, the Court finds no genuine dispute of fact as to Plaintiff's fourth claim and, as to this claim, (1) grants Plaintiff's motion and (2) denies Defendant's motion.

In its application for attorneys' fees and costs, Plaintiff must demonstrate that the fees and costs demanded are reasonable and were incurred in good faith. *See Am. Motorists Ins. Co. v. Trans Int'l Corp.*, 696 N.Y.S.2d 186, 187 (N.Y. App. Div. 1999). The Court notes, further, that Plaintiff will be awarded fees and costs not only for work that has been undertaken, but additionally for any future reasonable, good faith fees and costs that relate to this suit and Defendant's breach of the TSA.

## CONCLUSION

For the foregoing reasons, (1) Defendant's Motion for Summary Judgment is hereby **DENIED** as to Plaintiff's first and fourth claims and **GRANTED** as to Plaintiff's second and third claims; (2) Plaintiff's cross-Motion for Summary Judgment is hereby **GRANTED** as to its first and fourth claims and **DENIED**, without prejudice, as to its second and third claims.

**SO ORDERED.**

_____
Thomas C. Platt, U.S.D.J.

Dated: March 20, 2012
      Central Islip, New York

16